IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| KRISTEN MOODY, | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No.: SAG-25-00642 |
| THE BOARD OF EDUCATION OF WICOMICO COUNTY, | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Kristen Moody filed a Complaint against Defendant Board of Education of Wicomico County ("BEWC" or the "Board"), her former employer, alleging wrongful termination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and denial of her procedural due process rights pursuant to 42 U.S.C. § 1983. ECF 1. BEWC has filed a motion to dismiss pursuant to both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF 5. Plaintiff opposed the motion, ECF 9, and BEWC filed a reply, ECF 12. This Court has reviewed the filings and has determined that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons stated herein, BEWC's motion to dismiss will be granted.

## I.    FACTUAL BACKGROUND

The facts below are derived from the Complaint and taken in the light most favorable to Plaintiff, the non-moving party.

### A.    Plaintiff's drug use, rehabilitation, and employment prior to Fruitland Primary School

Plaintiff began working for BEWC, an independent local school system under the control of the Maryland State Board of Education, in August 2008 as a teacher at Northwestern Elementary School. ECF 1 ¶¶ 4–5.

In late 2019, Plaintiff suffered a mental health crisis and began using drugs. *Id.* ¶ 6. In January, 2020, she enrolled herself in an inpatient drug treatment rehabilitation program; she sought leave from work, pursuant to the Family Medical Leave Act, in order to attend inpatient and outpatient treatment. *Id.* ¶¶ 7–8. BEWC granted her request, Plaintiff successfully completed her treatment—she has not engaged in illegal drug use since—and in September, 2020, BEWC assigned her to work at its headquarters as a homeschool coordinator for the 2020–2021 school year. *Id.* ¶¶ 8–11. Following that school year, Plaintiff taught summer school for BEWC. *Id.* ¶ 12.

B. <u>Plaintiff's tenure at Fruitland Primary School and treatment by principal Linda Forbush</u>

In August, 2021, BEWC assigned Plaintiff to be a kindergarten teacher at Fruitland Primary School ("Fruitland") for the 2021/2022 school year. *Id.* ¶ 13. At that time, Fruitland's principal was Lisa Forbush, who was familiar with Plaintiff as both hailed from the same town in Somerset County. *Id.* ¶¶ 14–15. Despite Plaintiff having not discussed her drug use or recovery with Ms. Forbush, Ms. Forbush was aware, being from the same town as Plaintiff, that Plaintiff had attended drug treatment in 2020. *Id.* ¶¶ 15–16, 18. Over the ensuing two years during which Plaintiff taught at Fruitland, Ms. Forbush repeatedly and consistently made implicit reference to Plaintiff's previous struggles with drug addiction; Plaintiff cites this behavior as discrimination based on Plaintiff's history of, and what Ms. Forbush regarded as ongoing, drug use, and imputes this discrimination to BEWC. *Id.* ¶¶ 64, 70.

This pattern began at Plaintiff's orientation at Fruitland, when Ms. Forbush told Plaintiff she would be "'counsel[ing]' Plaintiff on getting back on the 'right path,'" and falsely implied to

Plaintiff's coworkers that Plaintiff had a criminal history (and that knowledge of Plaintiff's history was the reason for the parent of one of Plaintiff's prospective students requesting that student be transferred out of Plaintiff's class). *Id.* ¶¶ 16, 19. Ms. Forbush suggested to Plaintiff that Plaintiff try to minimize her "'associat[ion] with past events," including by changing her name. *Id.* ¶ 20.

On multiple occasions during the 2021–2022 school year, Ms. Forbush questioned Plaintiff's explanations for occurrences of illness and nausea, and implied that those occurrences were attributable to past or ongoing drug use or abuse. In October, 2021, Plaintiff took a few days of sick leave to recover from the flu. Upon Plaintiff's return, Ms. Forbush demanded and then disregarded Plaintiff's doctor's notes (verifying Plaintiff's illness) and proceeded to convene a meeting at Fruitland with Plaintiff and BEWC's HR Specialist, Erica Cooke, to discuss Plaintiff's sick leave, which Ms. Forbush characterized as a "red flag" in light of Plaintiff's past. *Id.* ¶¶ 22–27. In addition, after a particularly extreme bout of nausea at work, which (along with occasional headaches) Plaintiff attributes to her elevated blood pressure, Ms. Forbush asked the school nurse to opine on why she "thought" Plaintiff had become sick. *Id.* ¶ 28. Ms. Forbush further implied that Plaintiff's weight and excessive sweating were attributable to past or ongoing drug use or abuse (Plaintiff attributed her sweating to her classroom being unbearably hot, an issue she raised with Ms. Forbush but for which Ms. Forbush refused to take corrective action). *Id.* ¶¶ 29–30. Ms. Forbush's scrutiny of Plaintiff's physical appearance continued into Plaintiff's second year at Fruitland. *Id.* ¶¶ 31–33.

During Plaintiff's tenure at Fruitland, Ms. Forbush also treated Plaintiff differently from her co-workers. Ms. Forbush was constantly in Plaintiff's classroom observing her and specifically documenting her arrival times while not doing so for other teachers at Fruitland. *Id.* ¶¶ 21, 34-36. In December, 2022, when Plaintiff's students and their parents nominated Plaintiff as a candidate

for "Teacher of the Year" at Fruitland, Ms. Forbush omitted Plaintiff, only, from her public recognition of the candidates. *Id.* ¶¶ 37–38. In May, 2023, when Plaintiff's students achieved the highest test scores out of Fruitland's six kindergarten classes, Ms. Forbush abandoned the reward (a "dance party") she had initially promised to the class with the highest scores, and instead provided every kindergarten student with the same reward (an ice pop). *Id.* ¶¶ 39–42. Finally, while tardiness was a recurring issue among Fruitland's staff, Ms. Forbush publicly reprimanded Plaintiff, only, ostensibly for having more "tardies" than any other Fruitland employee, an assertion that the school's accountant deemed incorrect. *Id.* ¶¶ 43–45.

C. <u>Plaintiff's teaching certification</u>

To maintain her teaching certificate, Plaintiff had to earn six semester hours of acceptable credit within a five-year period ending on June 30, 2023; Plaintiff had earned three such hours prior to her tenure at Fruitland. *Id.* ¶¶ 50–51. Ms. Forbush had instructed all kindergarten teachers at Fruitland to take a six-credit course. *Id.* ¶ 52. Plaintiff attended all required classes for the course; however, a deterioration in her mental health (caused or exacerbated by Ms. Forbush's harassment) prevented Plaintiff from submitting the required coursework by the June 30, 2023 deadline. *Id.* ¶¶ 52–53. Plaintiff maintains that she did not receive any notice from Ms. Forbush or BEWC that failure to submit the coursework by the deadline would result in her termination. *Id.* ¶ 54.

D. <u>Plaintiff's termination</u>

On either July 10, or July 13, 2023 (*compare Id.* ¶ 48 *with Id.* ¶ 58), after Plaintiff began teaching and supervising Fruitland's summer school program—work for which BEWC paid Plaintiff—Ms. Forbush called her into a meeting with BEWC's HR Specialist, Ms. Cooke, and presented Plaintiff with a letter of termination (the "Termination Letter"). *Id.* ¶¶ 47–48, 58. The Termination Letter stated that Plaintiff's teaching certificate had expired as of June 30, 2023, and,

as a result, the Board was terminating her employment as a Kindergarten teacher at Fruitland, effective July 1, 2023. *Id.* ¶ 49. No hearing had been held regarding Plaintiff's termination. *Id.* ¶¶ 55–56. Despite BEWC maintaining that Plaintiff was unable to fulfill her professional duties due to her expired certification, Ms. Forbush informed Plaintiff that Plaintiff could continue on as the supervisor of the summer school program until its completion. *Id.* ¶ 57. Plaintiff alleges that the rationale provided for her termination in the Termination Letter was, therefore, pretextual; she alleges that BEWC was, in fact, acting on Ms. Forbush's discriminatory animus when it terminated her. *Id.* ¶¶ 57, 65. Plaintiff inquired about the possibility of reinstatement of her teaching license, but Ms. Forbush rejected the possibility without explanation, despite online resources from the State of Maryland providing otherwise. *Id.* ¶¶ 59–60. Plaintiff alleges that she could have continued to teach on a "provisional" certificate, but that BEWC failed to provide her with that opportunity. *Id.* ¶¶ 61–62, 65. Plaintiff alleges that her termination has left her without work— while BEWC "has allowed and continues to allow other employees to teach without their teaching certificate"—and resulted in damages, emotional distress, and irreparable damage to her reputation, including rumors associating Plaintiff with drugs which have prevented her from finding reemployment. *Id.* ¶¶ 63, 66, 68.

## II.     LEGAL STANDARDS[1]

### A.  Rule 12(b)(1)

Federal Rule of Civil Procedure (12)(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A challenge to jurisdiction may be either facial, *i.e.*,

---

[1] This Court notes that while the "Standard of Review" portion of BEWC's motion to dismiss appears to contemplate a 12(b)(6) motion only, ECF 5-1 at 7–8, BEWC explicitly invokes both 12(b)(1) and 12(b)(6) in arguing that Plaintiff's claims should be dismissed for failure to exhaust her remedies. ECF 5-1 at 8. Thus, this Court addresses both standards.

the complaint fails to allege facts upon which subject matter jurisdiction can be based, or factual, *i.e.*, jurisdictional allegations of the complaint are not true. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009); *Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). While the plaintiff bears the burden of proving that a court has jurisdiction over the claim or controversy at issue, a Rule (12)(b)(1) motion should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (quoting *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999)) (internal quotation marks and citation omitted). In a motion to dismiss for lack of subject matter jurisdiction, the pleadings should be regarded as "'mere evidence on the issue,'" and courts may "'consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Evans*, 166 F.3d at 647 (quoting *Richmond, Fredericksburg & Potomac R.R.*, 945 F.2d at 768 (4th Cir. 1991)).

**B.  Rule 12(b)(6)**

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *See, e.g.*, *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion to dismiss does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks omitted).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Rule 8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* 8(a)(2). The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

For a complaint to survive a Rule 12(b)(6) motion, the factual allegations contained therein need not be "detailed," but "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. It is not sufficient that the facts suggest "the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," such that the court could "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citations and internal quotation marks omitted). If the complaint sets forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, it will satisfy the minimal requirements of Rule 8(a)(2), "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the

factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011). "At bottom, a plaintiff must 'nudge[] [its] claims across the line from conceivable to plausible' to resist dismissal." *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Twombly*, 550 U.S. at 570) (alterations in *Cozart*).

In *Swierkiewicz v. Sorema N.A.*, the Supreme Court addressed the question of the proper pleading standard for a motion to dismiss in the specific context of an employment discrimination action, holding that "an employment discrimination plaintiff need not plead a prima facie case of discrimination . . . to survive [a] motion to dismiss." 534 U.S. 506, 515 (2002). The Court reasoned that "[t]he prima facie case . . . is an evidentiary standard, not a pleading requirement." *Id.* at 510. The heightened pleading standard adopted by the Supreme Court in *Twombly* and *Iqbal* has led courts to examine the extent to which the holding of *Swierkiewicz* in the employment discrimination context remains good law. The Fourth Circuit has stated that reconciliation and application of the pleading principles of *Swierkiewicz*, *Twombly*, and *Iqbal* is "straightforward": "*Swierkiewicz* remain[s] binding precedent and [a] plaintiff [is] not required to 'plead facts establishing a prima facie case of discrimination to survive a motion to dismiss.' . . . [H]owever, . . . a plaintiff is nonetheless 'required to allege facts to satisfy the elements of a cause of action created by [the relevant] statute' in compliance with *Iqbal*." *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017) (quoting *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 585 (4th Cir. 2015) (alteration in *Woods*). *See also Miller v. Md. Dep't of Nat. Res.*, 813 F. App'x 869 (4th Cir. 2020) (unpublished per curiam opinion) (applying standards from *Swierkiewicz* and *McCleary-Evans* to Rehabilitation Act and ADA claims); *Lazarte v. Montgomery Cnty. Pub. Schs.*, No. DLB-20-1515, 2021 WL 5770281, at *3 (D. Md. Dec. 6, 2021) ("At the pleading stage in an

employment discrimination lawsuit, a plaintiff is not required to plead facts establishing a prima facie case of discrimination to survive a motion to dismiss. . . . Still, the Court must consider the elements of a discrimination claim to discern whether plaintiff has stated a facially plausible claim.") (internal quotations and citations omitted). "[A] plaintiff is not required to plead a prima facie case of discrimination to overcome a motion to dismiss. . . . The correct standard is whether a plaintiff has plausibly alleged discriminatory conduct under the notice pleading standard of FED. R. CIV. P. 8(a)." *Hines v. Mayor and City Council*, No. SAG-22-1243, 2023 WL 3390902, at *4 (D. Md. May 11, 2023) (citing *Swierkiewicz* and *McCleary-Evans*).

### C. Exhibits

At the motion to dismiss stage, courts generally do not consider extrinsic evidence. It is well-recognized, however, that "the court may consider, without converting the motion to dismiss into one for summary judgment, documents attached to the complaint as exhibits, and documents attached to a motion to dismiss if the document is 'integral to the complaint and there is no dispute about the document's authenticity.'" *Reamer v. State Auto. Mut. Ins. Co.*, 556 F. Supp. 3d 544, 549 (D. Md. 2021) (quoting *Goines*, 822 F.3d at 166), *aff'd*, No. 21-3432, 2022 WL 17985700 (4th Cir. Dec. 29, 2022); *see also Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015) (internal quotation marks omitted). A document is "integral" where its "very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (internal quotation marks omitted) (emphasis removed).

In addition to those "integral" and "authentic" documents attached to the motion to dismiss, "a court may consider documents referred to and relied upon in the complaint—even if the documents are not attached as exhibits." *Harkum v. Jacobs Tech., Inc.*, No. GLR-22-479, 2023 WL

2163178, at *5 (D. Md. Feb. 22, 2023) (internal quotations omitted), and "courts may take judicial notice of publicly available records without converting a motion to dismiss to a motion for summary judgment." *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 502-03 (D. Md. 2019); *see also Wood v. Md. Dep't of Transp.*, 732 F. App'x 177, 184 n.3 (4th Cir. 2018) (unpublished) ("[I]n assessing the propriety of a Rule 12(b)(6) ruling, we may also properly take judicial notice of matters of public record."); *Goldfarb v. Mayor and City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) ("[A] court may properly take judicial notice of matters of public record and other information that, under Federal Rule of Evidence 201, constitute adjudicative facts.") (internal quotation marks omitted).

Here, BEWC has attached several exhibits to its Motion; these include (as represented by BEWC): (1) Plaintiff's contract of employment with BEWC, ECF 5-2; (2) Plaintiff's teaching certificate, ECF 5-3; (3) selected provisions from the Maryland Statutory Code and Code of Maryland Regulations ("COMAR"), ECF 5-4;[2] (4) the Termination Letter, ECF 5-5; (5) "VERIFY Educator Licensure Information" for Plaintiff, ECF 5-6; (6) the Collective Bargaining Agreement, applicable from 2022-2025, between BEWC and the Wicomico County Education Association ("WCEA") (the "WCEA CBA"), ECF 5-7; and (7) an "Opinion" issued by the Maryland State Board of Education, ECF 5-8. Plaintiff, in her Opposition, while herself referencing multiple of these exhibits, also argues that BEWC's arguments "based on facts outside of [her] Complaint . . . [are] inappropriate for a motion to dismiss . . . ." ECF 9-1 at 19.

The state statutory and regulatory provisions are indisputably relevant public records; thus, this Court may take judicial notice of ECF 5-4 (as well as, as necessary, other such provisions not

---

[2] These provisions, as attached to BEWC's motion and as referenced herein, are those that were in operation at the time of Plaintiff's termination, in July, 2023.

attached to BEWC's motion). In addition, Plaintiff's Complaint makes explicit or implicit reference to her contract with BEWC (ECF 1 ¶ 5 ("Plaintiff began working for the Board in August 2008 . . . .")), her teaching certificate (ECF 1 ¶¶ 50, 55 (Plaintiff was a certificated employee . . . .")), and the Termination Letter (ECF 1 ¶¶ 48–49, 58); and Plaintiff does not dispute the authenticity of these documents as attached to BEWC's motion (indeed, at least with respect to her contract, she references it herself in her Opposition (ECF 9-1 at 15, 18)). Thus, this Court can consider these documents as well. As for the CBA, to the extent BEWC attaches it to support its arguments regarding Plaintiff's failure to exhaust her contractual remedies, which it asserts under both 12(b)(1) and 12(b)(6), the Court can consider the document. *See Thornton v. Habibi*, No. 20-cv-2468-PX, 2021 WL 1856648, at *2 (D. Md. May 10, 2021) ("Where, as here, the motion rests on a written agreement to arbitrate disputes, the Court may look to the contents of that agreement even if outside the four corners of the complaint.").[3]  Regarding the MSBE Opinion, this Court notes that such opinions are routinely considered, even at the motion to dismiss stage. *See Gladhill v. Wash. Cnty. Bd. of Educ.*, No. MJM-23-0098, 2024 WL 1243833, at *8 (D. Md. Mar. 22, 2024) ("Because the MSBE has the '"last word" on controversies or disputes involving the proper administration of the public school system,' this Court considers the MSBE's expertise in interpreting the Education Article.") (quoting *Hurl v. Bd. of Educ.*, 667 A.2d 970, 976 (Md. Ct. Spec. App. 1995)); *Posey v. Navarro*, No. DLB-23-3453, 2025 WL 744065, at *1 n.1 (D. Md. Mar. 7, 2025) (citing MSBE opinion) (citing *Dyer v. Md. State Bd. of Educ.*, 187 F. Supp. 3d 599, 608 (D. Md. 2016)). Finally, this Court declines to consider ECF 5-6, despite BEWC's assertion that it is public record.

---

[3] This Court notes, further, that Plaintiff has not disputed the authenticity of the CBA; in her Opposition, she explicitly references BEWC's attachment. ECF 9-1 at 9.

### III.    ANALYSIS

**A.  Whether Plaintiff was required to submit her claim as a "grievance" under the applicable collective bargaining agreement.**

BEWC asserts that this Court should dismiss Plaintiff's claims—pursuant to both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure[4]—because Plaintiff has not sought to have her allegations addressed through the "grievance process" articulated in the Collective Bargaining Agreement that governed Plaintiff's employment. ECF 5-1 at 8–11. In her Opposition, Plaintiff's discussion of the WCEA CBA grievance procedure focused not on whether the WCEA CBA, if applicable to her, required exhaustion of the "grievance" steps articulated therein; rather, Plaintiff argues that the WCEA CBA, by its terms, no longer applied to her upon her termination, a proposition BEWC contests in its Reply. *See* ECF 9-1 at 8-10; ECF 12 at 2-3. This Court need not reach this question, though, as the Court concludes, on BEWC's original point, that the provisions of the WCEA CBA did not waive Plaintiff's right to a federal forum for adjudication of her claims under either 29 U.S.C. § 794 or 42 U.S.C. § 1983.

The Supreme Court, in *Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70 (1998) ("*Universal Maritime*"), made clear that for claims brought pursuant to federal nondiscrimination statutes to be found subject to mandatory arbitration under a collective bargaining agreement, the agreement must include "clear and unmistakable" language to that effect. *Id.* at 79–80; *Brown v.*

---

[4] There is not a clear consensus as to whether a motion to dismiss predicated on a failure to exhaust remedies (including arbitration) provided for in a CBA should be evaluated through the lens of 12(b)(1) (with the agreement to arbitrate being considered a jurisdictional bar) or 12(b)(6). *See Manganaro Corp., Md. v. Turner Constr. Co.*, No. DKC 2005-2282, 2006 WL 8456953, at *2–5 (D. Md. Mar. 30, 2006) (noting that "case law, including that from the Fourth Circuit, is inconsistent" on the question of which rule is the proper basis of dismissal); *Thornton*, 2021 WL 1856648, at *2 ("This Court has considered motions to dismiss in favor of arbitration under both provisions."); 5B Wright & Miller's Federal Practice and Procedure § 1350 (4th ed. Sept. 2025 update). However, the debate as to which rule is applicable is largely academic; thus, this Court does not decide under which rule the motion is more appropriately considered.

*ABF Freight Sys., Inc.*, 183 F.3d 319, 321 (4th Cir. 1999) ("[T]he Court established that a union-negotiated waiver of employees' right to a federal judicial forum for statutory employment-discrimination claims must be clear and unmistakable."). Thus, while "[t]he question [of] whether the parties to a CBA agreed to arbitrate discrimination claims arising under the ADA—or any other federal statutory antidiscrimination law—is one of contract interpretation," courts "do not apply the usual interpretive presumption in favor of arbitration" to such claims. *Brown*, 183 F.3d at 321. *See also Carson v. Giant Food, Inc.*, 175 F.3d 325, 332 (4th Cir. 1999) ("[C]lear and unmistakable does not mean general language that under ordinary principles of contract interpretation might very well be interpreted to require arbitration."). BEWC does not specifically argue that Plaintiff was contractually required to submit her claim to arbitration; it argues that Plaintiff was required to submit her claim through the *grievance process* in Article 2 of the WCEA CBA (within which arbitration is the fifth and final step). This distinction does not, however, affect the applicability of the "clear and unmistakable" standard to the issue as BEWC has raised it. *See, e.g., Gonzalez v. Prince George's Cnty.*, No.  PWG-17-159, 2017 WL 2865015, at *3 (D. Md. July 5, 2017) (reviewing a CBA with a four-step grievance procedure, with arbitration being the final step, and stating, "While an employee may agree by contract to follow grievance procedures, including arbitration, for statutory claims instead of pursuing them in court, an employee is not required to do so unless the waiver of litigation is 'clear and unmistakable' in the agreement between . . . his or her union and the employer.").

The Fourth Circuit, applying *Universal Maritime*, has articulated two methods by which "the requisite degree of clarity can be achieved." *Carson*, 175 F.3d at 331. Under either method, the key characteristic is *explicitness*. The first approach "simply involves drafting an *explicit* arbitration clause[,] . . . a clear and unmistakable provision under which the employees agree to

submit to arbitration all federal causes of action arising out of their employment." *Id.* (emphasis added). When the arbitration clause, itself, uses "broad but nonspecific language," however, the second method applies, which requires the arbitration clause to be supplemented by "an '*explicit* incorporation of statutory antidiscrimination requirements' elsewhere in the contract. . . . If another provision, like a nondiscrimination clause, makes it unmistakably clear that discrimination statutes at issue are part of the agreement, employees will be bound to arbitrate their federal claims." *Id.* (emphasis added) (quoting *Universal Maritime*). "While it is . . . possible to meet the clear and unmistakable waiver standard of *Universal Maritime*, it is not easy." *E. Associated Coal Corp. v. Massey*, 373 F.3d 530, 534 (4th Cir. 2004).

The April 12, 2022 WCEA CBA does not reach the required clarity under the first method. "General arbitration clauses, such as those referring to 'all disputes' or 'all disputes concerning the interpretation of the agreement,' taken alone do not meet the clear and unmistakable requirement of *Universal Maritime*." *Carson*, 175 F.3d at 332. The WCEA CBA defines "grievance" as "an alleged violation, misinterpretation, or misapplication of the terms *of this Agreement*." ECF 5-7 at 1 (§ 2.01B) (emphasis added). Later, in describing the purview of the arbitrator (in the event the grievance has moved through the first four steps of the five-step process the WCEA CBA provides for), the WCEA CBA states, "The jurisdiction and authority of the arbitrator of the grievance and his/her opinion and award *shall be confined to the provision or provisions of this Agreement at issue* between the Association and the Board." *Id.* at 2 (§ 2.02E) (emphasis added). Thus, the WCEA CBA provisions describing the grievance process do not contain any "clear and unmistakable" agreement to submit federal causes of action to arbitration. *Contrast Brown*, 183 F.3d at 321-22 ("Because the arbitration clause refers only to grievances arising under the Agreement, it cannot be read to require arbitration of those grievances arising out of alleged

statutory violations.") *with Singletary v. Enersys, Inc.*, 57 F. App'x 161 (4th Cir. 2003) (unpublished per curiam) (court finding clear and unmistakable waiver in CBA provision that stated, "Any and all claims . . . under any federal or state employment law shall be exclusively addressed by an individual employee or the Union under the grievance and arbitration provisions of this Agreement.").

As for the second method, the WCEA CBA contains a "Non-Discrimination" provision that reads as follows:

> The provisions of this Agreement shall be applied without regard to age, gender, race, color, religion, national origin, sexual orientation, and handicap. The parties further stipulate that this Agreement shall be interpreted in such a manner as to be consistent with and subject to the nondiscrimination provisions of the United States Constitution and statutes, regulations and guidelines enacted pursuant thereto.

ECF 5-7 at 21 (§ 14.04). BEWC argues that because "[t]he CBA contains a non-discrimination provision . . . , discharge based on alleged discrimination would violate the CBA, requiring Ms. Moody to exhaust her contractual remedies through the grievance process before seeking a judicial remedy." ECF 5-1 at 10. The Fourth Circuit has had multiple occasions to apply the *Wright* standard. A survey of those decisions, to the extent they have defined a spectrum of what constitutes "clear and unmistakable" language in non-discrimination provisions, leads this Court to conclude that the Non-Discrimination provision in the WCEA CBA does not meet this standard.

First, the Fourth Circuit has repeatedly emphasized that a non-discrimination provision that simply states the parties' agreement not to, themselves, engage in any discriminatory action, does not constitute an explicit incorporation of federal statutory discrimination law into an agreement. *See Brown*, 183 F.3d at 322 ("There is a significant difference, and we believe a legally dispositive one, between an agreement not to commit discriminatory acts that are prohibited by law and an agreement to incorporate, in toto, the antidiscrimination statutes that prohibit those acts."); *Carson*,

175 F.3d at 332 ("The agreements do contain antidiscrimination provisions stating that the company and the union agree not to discriminate on the basis of race or age. They do not, however, begin to incorporate by reference federal statutory law."). This is the case even where the nondiscrimination clause "parallel[s], or even parrot[s], the language of federal antidiscrimination statutes." *Brown*, 183 F.3d at 322. *See also Massey*, 373 F.3d at 536 ("[I]t is not enough for a contractual anti-discrimination clause to loosely approximate the language of anti-discrimination statutes. . . . Such statutory provisions must be explicitly incorporated into the CBA in order to constitute a valid waiver."). Thus, the first sentence of § 14.04 of the WCEA CBA, which similarly prohibits discrimination in the *application of the agreement*, does not satisfy the *Wright* standard.[5]

Neither does the second sentence of § 14.04, which states that the WCEA CBA "shall be interpreted in such a manner as to be consistent with and subject to the nondiscrimination provisions of the United States Constitution and statutes, regulations and guidelines enacted pursuant thereto." In *Universal Maritime*, when faced with a CBA clause stating "the intention and purpose of all parties hereto that no provision or part of this Agreement shall be violative of any Federal or State Law," the Supreme Court stated that, even if that clause were understood to require an arbitrator to apply legal definitions derived from a federal statute—and the Court concluded that the clause "[did] not incorporate the ADA by reference"—"that is not the same as making compliance with the [statute] a contractual commitment that would be subject to the arbitration clause." 525 U.S. at 79, 81. As a point of comparison, in *Safrit v. Cone Mills Corp.*, the Fourth Circuit found a "clear and unmistakable" waiver of a right to a federal judicial forum where an

---

[5] BEWC emphasizes the express inclusion, in the first sentence of § 14.04, of the term "handicap" among other bases of impermissible discrimination in the application of the agreement, *see* ECF 5-1 at 6; however, that reference "merely add[s] to the list of protected classes against which the parties agreed not to discriminate." *Birch v. The Pepsi Bottling Grp., Inc.*, 207 F. Supp. 2d 376, 383 (D. Md. 2002).

antidiscrimination provision explicitly referenced Title VII of the Civil Rights Act of 1964 *and* stated that "[u]nresolved grievances arising under this Section are the proper subjects for arbitration." 248 F.3d 306, 308 (4th Cir. 2001) (per curiam). Here, § 14.04 of the WCEA CBA contains no such mention of the grievance process or arbitration.

"[T]he right to a federal judicial forum is of sufficient importance to be protected against less-than-explicit union waiver in a CBA." *Universal Maritime*, 525 U.S. at 80. This Court cannot conclude that the provisions of the WCEA CBA satisfy the requirement, under *Universal Maritime*, "that collective bargaining agreements eliminate any doubt that a waiver of a federal forum was intended." *Aleman v. Chugach Support Servs., Inc.*, 485 F.3d 206, 216 (4th Cir. 2007). Thus, Plaintiff was not required to adjudicate her claims using the Article 2 grievance process, and this Court will address them.

## B. Count I: Wrongful Termination under Rehabilitation Act

Plaintiff is "required to allege facts to satisfy the elements of a cause of action created by [the] statute" pursuant to which the claim is brought. *McCleary-Evans*, 780 F.3d at 585. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).[6] Plaintiff has brought a claim for wrongful termination under the Rehabilitation Act, alleging that "[BEWC] . . . wrongfully terminated Plaintiff . . .on the basis of her actual disability, because of her record of disability, and / or because it regarded her erroneously as using drugs." ECF 1 at 1.

---

[6] Plaintiff has alleged that BEWC is "a recipient of federal financial assistance and/or operates a program which is a recipient of federal funding," ECF 1 at ¶ 4, and BEWC does not dispute this.

For a claim of disability discrimination under the Rehabilitation Act, a plaintiff "must show that (1) she is disabled; (2) she was otherwise qualified for the position; and (3) she suffered an adverse employment action solely on the basis of her disability." *Hannah P. v. Coats*, 916 F.3d 327, 342 (4th Cir. 2019). In its motion to dismiss, BEWC argues that Plaintiff has failed to establish "that she was disabled at the time of her termination, that she was a qualified individual, or that she was terminated solely based on her alleged disability." ECF 5-1 at 11.

BEWC's motion to dismiss is predominantly predicated on its assertion that the basis for Plaintiff's termination in July, 2023 was the expiration of her teaching certificate. Plaintiff has effectively conceded that, at the time of her termination, her teaching certificate had expired, *see, e.g.*, ECF 9-1 at 5 ("Notwithstanding the fact Ms. Moody failed to meet the renewal requirements of her certificate, . . ."),[7] and this point is further corroborated by documents attached to BEWC's motion, which this Court has already determined it may consider. *See, e.g.*, ECF 5-3 (Plaintiff's "Maryland Educator Certificate," showing a "Valid" period of 7/1/2018 – 6/30/2023").

Thus, Plaintiff's wrongful termination claim under the Rehabilitation Act would appear to rest entirely on her allegation that "the Board has allowed and continues to allow other employees to teach without their teaching certificate," ECF 1 ¶ 63, coupled with her allegations that BEWC, in fact, did so by allowing *Plaintiff* to supervise and teach Fruitland's summer school program for more than a week after her certificate expired, and that Ms. Forbush informed Plaintiff that she could *continue* to supervise the summer school program even after her certificate expired (indeed,

---

[7] *See also* ECF 1 ¶ 49 ("[a]ccording to the Termination Letter, [her] teaching certificate had expired as of June 30, 2023"); *Id.* ¶ 50 ("To maintain her teaching certificate, Plaintiff had to earn six semester hours of acceptable credit within a five-year period"); *Id.* ¶ 53 ("Plaintiff was unable to submit all coursework for the six-credit course by the June 30, 2023 deadline."); *Id.* ¶ 61 ("Plaintiff could have been given a provisional certificate while obtaining the additional three credits she needed *to reinstate her expired certificate*.") (emphasis added).

even after her termination). *Id.* ¶¶ 47–49, 57–58. Presumably, Plaintiff asks this Court to infer that, her expired certificate notwithstanding, the actual basis for BEWC's termination of her employment was her "disability," thus satisfying her pleading burden with respect to the third element—causation—of her Rehabilitation Act claim.[8]

As a threshold matter, it is not clear to this Court that the allegation of causation suggested by ¶ 63 would suffice to move Plaintiff's claim over the line from "conceivable" to "plausible," even assuming that Plaintiff had sufficiently pleaded the other required elements of her claim. *Compare Shorter v. Md. Rural Dev. Corp.*, No. RDB-13-953, 2014 WL 3051492, at *4 ("Simple assertions like . . . 'my peers have/had been in the same situation and no one was terminated' are not sufficient to meet the *Iqbal* standard.") *with Snoddy v. Prince George's Cnty. Gov't*, No. SAG-21-2528, 2023 WL 5509323, at *5 (D. Md. Aug. 24, 2023) ("Whether Plaintiff will eventually be able to establish, for example, that other similarly situated employees were treated differently is not the standard at the motion to dismiss phase. The correct standard is whether a plaintiff has

---

[8] Plaintiff also alleges that BEWC "failed to provide Plaintiff with the opportunity to reinstate her certificate before the start of the 2023/2024 school year," ECF 1 ¶ 65, and devotes part of her Opposition to BEWC's motion to describe the process by which an employee with an expired professional license may continue to teach *with a temporary or conditional license*. ECF 9-1 at 15-16, before asserting:

> There is no dispute Ms. Moody was eligible for a Temporary Professional License . . . . The Board, acting through Ms. Forbush, chose not to request a Temporary Professional License for Ms. Moody and told Ms. Moody she was ineligible to reapply for employment after her Professional Teacher License was reinstated because Ms. Forbush knew Ms. Moody had a history of drug addiction, . . . and because . . . Ms. Forbush regarded Ms. Moody – erroneously – as continuing to use drugs.

*Id.* at 16. This language could be read to suggest that Plaintiff is arguing there was discrimination in the Board's decision *not* to request a temporary or conditional credential for her; however, as BEWC notes, ECF 12 at 5 n.2., such arguments are not relevant to Plaintiff's one asserted claim under the Rehabilitation Act—for *wrongful termination*. This Court will not address claims not raised in her Complaint (though it notes that such claims would likely encounter the same issues discussed, *infra*, regarding failure to allege that BEWC regarded Plaintiff as disabled).

plausibly alleged discriminatory conduct under the notice pleading standard of Fed. R. Civ. P. 8(a).").

However, this Court need not decide that question, because it cannot conclude that Plaintiff's Complaint has sufficiently pleaded the *first* element of her claim—that BEWC regarded her as having a "disability."

The Rehabilitation Act defines disability, by reference to the Americans with Disabilities Act of 1990 (the "ADA"), as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 29 U.S.C. § 705(20)(B) (defining the term "individual with a disability," for purposes of subchapter V of the Rehabilitation Act (among other sections) as "any person who has a disability as defined in section 12102 of Title 42."); 42 U.S.C. § 12102(1); *see also* 45 C.F.R. § 84.10; 29 C.F.R. § 1630.2(g).

While Plaintiff frames Count I of her Complaint with implied reference to each of the three definitions under § 12102(1), *see* ECF 1 ¶ 70, her Opposition to the motion to dismiss would appear to confirm that she intends for her allegations to show a "disability" as defined by the third definition—a "regarded as" disability. ECF 9-1 at 10–14. Specifically, she relies on Ms. Forbush's "regard[] [of] Plaintiff (erroneously) as illegally using drugs," ECF 1 at ¶ 70, despite Plaintiff having been "drug-free" since being discharged from drug treatment in 2020. *Id.* ¶¶ 6–10.

While the third definition ("regarded as") stated in § 12102(1) would appear, by reference to "such an impairment," to also incorporate the element of "substantial[] limit[ation] [of] one or more major life activities" that is required to satisfy the first two definitions, Congress expressly amended the ADA in 2008 to elaborate on this third kind of "disability" and expand its scope. Section 12102(3)(A) provides that "[a]n individual meets the requirement of 'being regarded as

having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits <u>or is perceived to limit</u> a major life activity*." 42 U.S.C. § 12102(3)(A) (emphases added); *Miller*, 813 F. App'x at 876 (quoting 42 U.S.C. § 12102(3)(A)).

Based on the plain language of the statute, a plaintiff, when pleading a "regarded as" "disability" for a Rehabilitation Act claim, need only allege the perception of a physical or mental impairment, they need not allege there was an *additional* perception that the perceived disability limited a major life activity. *See Berkner v. Blank*, No. DKC 12-1390, 2013 WL 951562, at *3 n.4 (D. Md. Mar. 11, 2013), *aff'd*, 561 F. App'x 279 (4th Cir. 2014) (unpublished per curiam) (to establish a "disability" pursuant to the third prong of the ADA definition (as amended by the ADA Amendment Acts of 2008), and derivatively under the Rehabilitation Act, "Plaintiff need only establish that her 'employer regarded [her] as being impaired, not that the employer believed the impairment prevented the plaintiff from performing a major life activity.'") (quoting *Wolfe v. Postmaster Gen.*, 488 F. App'x 465, 468 (11th Cir. 2012)) (alteration in *Berkner*); *see also Brown v. City of Jacksonville*, 711 F.3d 883, 888-89 (8th Cir. 2013).

Importantly, however, it is the perception of the plaintiff's *employer* that is pertinent to pleading a "regarded as" disability. "[T]he ADA and the Rehabilitation Act provide for remedies against *employers*, not individuals, unless those individuals qualify as employers." *Lewis-Davis v. Bd. of Educ. of Balt. Cnty.*, No. ELH-20-0423, 2021 WL 4772918, at *13 (D. Md. Oct. 13, 2021) (emphasis in original) (plaintiff failed to state a claim for disability discrimination under ADA and Rehabilitation Act where plaintiff alleged that her supervisor and co-worker, also employees of the board of education, but not the board itself, regarded plaintiff as having mental or emotional health

issues); *Berkner*, 2013 WL 951562, at *3 ("To establish a prima facie case under the Rehabilitation

Act, Plaintiff must show that she: (1) was disabled or perceived as being disabled *by her employer*;

. . .") (emphasis added). Plaintiff brought her suit against BEWC as her employer and the party

that terminated her. ECF 1 ¶¶ 3–4 (identifying no defendants beyond BEWC). Her Complaint,

however, is nearly devoid of reference to any actions of BEWC toward Plaintiff prior to her

termination, let alone any that support an inference that BEWC perceived her as having an

impairment. While the introduction to Plaintiff's complaint states, "The Board subjected Plaintiff

to unlawful discrimination and wrongfully terminated Plaintiff without due process of law on the

basis of her actual disability, because of her record of disability, and/or because it regarded her

erroneously as using drugs," *Id.* at 1, the discrimination and harassment subsequently alleged is

entirely that of Ms. Forbush.  Indeed, Plaintiff alleges only the following actions (or inactions) by

BEWC prior to her termination:

- BEWC employed Plaintiff beginning in August 2008. ECF 1 ¶ 5.

- BEWC granted Plaintiff's request for leave, pursuant to the FMLA, to attend inpatient and
  outpatient drug treatment. *Id.* ¶ 8.

- Upon Plaintiff's successful completion of her rehabilitation program, BEWC employed
  Plaintiff as a homeschool coordinator for the 2020–2021 school year, and as a summer
  school teacher in summer, 2021. *Id.* ¶ 12–13.

- In August, 2021, BEWC assigned Plaintiff to be a kindergarten teacher at Fruitland. *Id.* ¶
  13.

- Sometime around fall, 2021, BEWC's HR Specialist, Ms. Cooke, met, at Ms. Forbush's
  invitation, with Ms. Forbush and Plaintiff at Fruitland to discuss Plaintiff's use of sick leave
  to recover from the flu. *Id.* ¶¶ 22–27.

- BEWC paid Plaintiff for teaching and supervising summer school in early July, 2023, before notifying her of her termination. *Id.* ¶ 58.

- BEWC did not tell Plaintiff that she would be terminated if she did not submit coursework for the six-credit course by the June 30, 2023 deadline. *Id.* ¶ 54.[9]

Regarding the meeting between Plaintiff, Ms. Forbush, and Ms. Cooke, Plaintiff has alleged that, "[a]ccording to Ms. Forbush, she called the meeting because Plaintiff's use of sick leave was a 'red flag' in light of Plaintiff's past. *Id.* ¶ 27. Plaintiff has not alleged whether Ms. Forbush made this statement *in* the meeting, in the presence of Ms. Cooke; however, even if this Court were to assume she did, that allegation would still be insufficient to suggest that *BEWC* regarded Plaintiff as disabled (particularly when BEWC was already aware of Plaintiff's "past," having granted her leave for treatment and then re-hiring her).

Further, Plaintiff's statements that BEWC, "acting through Ms. Forbush, discriminated against and harassed Plaintiff" and that "Ms. Forbush, acting on behalf of the Board, discriminated against and harassed Plaintiff" are conclusory in the absence of any allegations to support the inference that Ms. Forbush, despite her supervisory position in relation to Plaintiff, engaged in the alleged discrimination on BEWC's behalf. *Id.* ¶¶ 64, 70.[10]

---

[9] Plaintiff also alleged that BEWC "did not notify Plaintiff of her right to be heard or explain how her failure to obtain three additional credits rose to the level of insubordination, incompetency, or willful neglect of duty," which Plaintiff alleges were the only possible grounds for her termination as a certificated, tenured employee. ECF 1 ¶¶ 55–56. This Court discusses these allegations in its assessment of Plaintiff's procedural due process claim.

[10] The only allegation in the Complaint which suggests any action of Ms. Forbush in the place of BEWC is her alleged negative response to Plaintiff's question of whether she could apply for her teaching license to be reinstated. ECF 1 ¶ 59 ("When Plaintiff inquired if she could apply back to the Board after completing the coursework necessary to reinstate her teaching license, Ms. Forbush emphatically said, 'No,' without explanation or justification.").

Plaintiff has failed to sufficiently plead that her *employer*, BEWC, regarded Plaintiff as disabled; thus, she has failed to state a claim for wrongful termination under the Rehabilitation Act under the traditional theory of liability.

There is, however, an alternative theory of liability in the employment discrimination context that does *not* require that the plaintiff's *employer*, themselves, have acted with discriminatory intent. Under this theory, commonly referred to as the "cat's paw" theory of liability, an employer may be held liable for a subordinate's discriminatory animus. "Cat's paw" liability may be found "[w]hen a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate," as in such circumstances "it is not inconsistent to say that the subordinate is the actual decisionmaker or the one principally responsible for the contested employment decision . . . ." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 290 (4th Cir. 2004) (en banc). While this inquiry necessarily involves an assessment of whether a plaintiff has adequately pleaded that the *subordinate* had discriminatory animus toward them (in this case, based on Ms. Forbush having regarded Plaintiff as disabled), it primarily assesses whether a plaintiff has pleaded a causal connection between the subordinate's animus and the ultimate decision of the formal decisionmaker.  While neither of the Parties have explicitly invoked this theory, Plaintiff does allege (though in conclusory fashion) that BEWC was "acting on behalf of Ms. Forbush's discriminatory animus" when it terminated Plaintiff, suggesting a "cat's paw" theory of liability, ECF 1 ¶ 65, and BEWC has argued that Plaintiff "fails to allege any facts supporting her claim that *the Board* regarded her as disabled . . . ." ECF 5-1 at 15 (emphasis added).

The "cat's paw" theory of liability was endorsed by the Supreme Court in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011); by the Court's articulation, "if a supervisor performs an act

motivated by [unlawful] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment[ action], then the employer is liable." *Id.* at 422 (emphasis in original). While the Supreme Court adopted the theory in the context of antimilitary animus and the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), the Fourth Circuit, both prior to and after *Staub*, endorsed its application with respect to claims brought under Title VII of the Civil Rights Act and the Age Discrimination in Employment Act of 1967 ("ADEA"). *See Hill*, 354 F.3d at 290–91 (applying cat's paw theory to Title VII and ADEA claims); *Smyth-Riding v. Scis. and Eng'g Servs., LLC*, 699 F. App'x 146, 155 (4th Cir. 2017) (unpublished) (stating that *Staub*'s holding is applicable to Title VII claims "because it relied on traditional agency principles to hold that the so-called cat's paw theory of liability is a possible means of holding employers liable for discriminatory conduct."); *Barnhill v. Bondi*, 138 F.4th 123 (4th Cir. 2025) (reviewing dismissal of Title VII discrimination and retaliation claims); *see also Phillips v. Raytheon Applied Signal Tech., Inc.*, No. ELH-11-3230, 2013 WL 5440802, at *15 n.19 (D. Md. Sept. 27, 2013), *aff'd*, 556 F. App'x 265 (4th Cir. 2014) (unpublished per curiam) ("Although the claim in *Staub* arose under the Uniformed Services Employment and Reemployment Rights Act rather than Title VII, the Fourth Circuit has endorsed this so-called 'cat's paw' theory of liability in the Title VII and ADEA context . . . .") (citing *Hill*).

While the Fourth Circuit has recognized that *Staub*'s "reli[ance] on traditional agency principles" in endorsing "cat's paw" liability supports application of the theory to other employment discrimination statutes, *Smyth-Riding*, 699 F. App'x at 155, it has also recognized that claims brought under the various discrimination statutes must satisfy differing standards of causation, and thus, application of the theory may have different contours depending on the statute at issue:

> Because the USERRA uses a mixed-motive causation standard, while Title VII retaliation claims use a but-for causation standard, the Supreme Court's articulation of when an employer can be held liable ordinarily would require some refinement in a Title VII retaliation case . . . . That is to say, while *Staub* permitted a plaintiff to prevail under a cat's paw theory of liability where the supervisor's action was only "*a* causal factor" in the analysis, . . . a Title VII retaliation plaintiff would have to show that but for the supervisor's conduct, the adverse employment action would not have occurred.

*Smyth-Riding*, 699 F. App'x at 155 n.11 (quoting *Staub*, 562 U.S. at 420–21 (emphasis added)).

Neither the Supreme Court nor the Fourth Circuit has analyzed the applicability of the "cat's paw" theory to a claim under the Rehabilitation Act, which is recognized to employ a more stringent standard of causation—though debate as to whether that standard is one of "but-for" causation or "sole" causation has resulted in a circuit split[11]—than the "mixed-motive" standard of USERRA. Multiple federal Courts of Appeals, having concluded that the Rehabilitation Act requires a showing that the alleged discrimination was the "sole" basis for the challenged action, have expressly rejected the applicability of the "cat's paw" theory to claims under § 504 of the Rehabilitation Act. *See Kowalski v. Postmaster Gen. of United States*, 811 F. App'x 733, 739 (3d Cir. 2020) ("[T]he cat's paw theory originated in the context of mixed-motive discrimination claims. . . . Section 504, however, does not permit mixed-motive claims; rather, it requires that a disability be the sole, as opposed to a partial, cause of the adverse employment decision. . . . That requirement removes Section 504 claims from the reach of the cat's paw theory."); *Harmon v.*

---

[11] *Contrast Natofsky v. City of New York*, 921 F.3d 337, 345 (2d Cir. 2019) (concluding that "when a plaintiff alleges an employment discrimination claim under the Rehabilitation Act, the causation standard that applies is the same one that would govern a complaint alleging employment discrimination under the ADA."), *with Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 505 (5th Cir. 2002) (concluding that "[b]ecause Congress chose not to repeal the 'solely by reason of' language of § 794(a) when it amended the statute, . . . Congress did not intend to adopt the ADA standard of causation with the § 794(d) amendment."). The Fourth Circuit does not appear to have directly engaged with the question. *See Bozarth v. Md. State Dep't of Educ.*, No. DLB-19-3615, 2021 WL 1225448, at *14–17 (D. Md. Mar. 31, 2021)

*Collier*, -- F.4th --, 2025 WL 2912512, at *12 (5th Cir. Oct. 14, 2025) (citing *Soledad*, 304 F.3d 500 (5th Cir. 2002) for proposition that "[d]iscrimination claims under the Rehabilitation Act . . . require sole causation," and holding that invocation of "cat's paw" theory with respect to such claims "fails as a matter of law" because the sole causation standard "is impossible to meet using cat's paw reasoning, at least in the context here: the co-worker's discriminatory animus can never be the sole cause of the adverse employment action because the adverse employment action is also necessarily caused by the titular decisionmaker's independent choice to give decisive weight to the co-worker's recommendation."). However, other federal Courts of Appeals have engaged with a "cat's paw" argument on a Rehabilitation Act claim without addressing the question of the impact of the applicable causation standard on the applicability of the "cat's paw" theory. *See Royan v. Chi. State Univ.*, 145 F.4th 681, 692–93 (7th Cir. 2025) (noting, "Our precedent makes clear that the Rehabilitation Act's causation standard is more stringent than the ADA's 'but for' inquiry," then proceeding to briefly address plaintiff's invocation of "cat's paw" theory for her claims—brought solely under Section 504—but with no examination of applicability of that theory to such claims); *Mattioda v. Nelson*, 98 F.4th 1164, 1178 (9th Cir. 2024) (reviewing grant of summary judgment on disability discrimination claim under Rehabilitation Act and stating, without defining the causation standard under the Rehabilitation Act, that a plaintiff may rely on a "cat's paw" theory to establish the requisite causal link); *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568 (6th Cir. 2022) (after determining that "but-for" causation standard covered former federal employee's claim under *§ 501* of the Rehabilitation Act, proceeding to engage with "cat's paw" argument).

This Court need not decide the question, as it concludes that, regardless of the standard of causation applied to Plaintiff's Rehabilitation Act claim, her factual allegations, taken as true, do not sufficiently plead the "cat's paw" theory.

The Fourth Circuit has stated that when determining the applicability of the "cat's paw" theory, even allegations that a biased subordinate had "substantial influence on the ultimate decision or . . . played a role, even a significant one, in the adverse employment decision" will not render that subordinate a "decisionmaker" such as to impute the subordinate's unlawful animus to the employer. *Hill*, 354 F.3d at 290–91; *id.* ("Regarding adverse employment actions, an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision."). While the Fourth Circuit originally articulated these propositions in the context of a case (*Hill*) in which plaintiff was attempting to impute the discriminatory animus of a *coworker* (a safety inspector with no supervisory or disciplinary authority) to her employer, it has also reiterated them in examining the applicability of the "cat's paw" theory to facts involving an individual in a supervisory position. *See Roberts v. Gestamp W. Va., LLC*, 45 F.4th 726, 738–39 (4th Cir. 2022) (citing *Hill*, 354 F.3d at 291, affirming grant of summary judgment where there was no evidence that an individual who "had supervisory and some disciplinary authority" had "any role in terminating employees" or "took a position on whether to fire" plaintiff, and thus that individual could not be found to be the "actual decision-maker behind [plaintiff's] termination" such that "cat's paw" theory could lie). *See also Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401 (4th Cir. 2013) (citing *Hill*, 354 F.3d at 290–91, affirming grant of summary judgment where plaintiff had presented no evidence to demonstrate that her supervisor "possessed such authority as to be viewed as the one principally responsible

for the decision.") (internal quotation marks omitted); *Crockett v. Mission Hosp., Inc.*, 717 F.3d 348 (4th Cir. 2013).

In its recent decision in *Barnhill*, the Fourth Circuit reiterated that "the discriminatory animus of an employee can be imputed onto the employer to establish causation—known as the 'cat's paw' theory" "in certain rare instances." 138 F.4th at 134 (citing *Hill*, 354 F.3d at 290–91). The court specifically elaborated on a plaintiff's pleading burden for invocation of this theory:

> To satisfy the cat's paw theory at the motion to dismiss stage, a plaintiff must plead that a coworker harboring discriminatory animus toward her exercised authority over an adverse employment action that the plaintiff suffered such that the colleague should be viewed as the 'actual decisionmaker' principally responsible for the adverse action.

*Barnhill*, 138 F.4th at 134.

This Court concludes that Plaintiff has pleaded sufficient facts to raise the reasonable inference that her supervisor, Ms. Forbush, "regarded [her] as" having an impairment under the Rehabilitation Act; specifically, that of drug addiction or being in recovery from such addiction, and harbored discriminatory animus based on that perceived impairment. To sufficiently plead a "cat's paw" theory of liability, however, Plaintiff must also have sufficiently pleaded that Ms. Forbush "exercised authority" over Plaintiff's termination such that Ms. Forbush "should be viewed as the 'actual decisionmaker' principally responsible" for the termination. *Barnhill*, 138 F.4th at 134. This Court cannot conclude that Plaintiff has done so. The closest Plaintiff comes to alleging that Ms. Forbush possessed any sort of authority over Plaintiff's termination is in Plaintiff's conclusory allegation that "[t]he Board's unlawful employment actions [were] perpetuated by Ms. Forbush." ECF 1 ¶ 67. Plaintiff's allegation that, when she asked if she could apply to the Board for reinstatement, Ms. Forbush said, "No," "without explanation or

justification," *Id.* ¶ 59, without more, is not sufficient for this Court to infer that Ms. Forbush held any authority to take tangible action regarding Plaintiff's employment.

Further, the only action Plaintiff alleges on the part of Ms. Forbush that could be inferred as being "intended . . . to cause an adverse employment action," *Staub*, 562 U.S. at 422, is that Ms. Forbush, sometime in fall 2021, called a meeting with BEWC's HR Specialist "to discuss [Plaintiff's] time off from work," which Ms. Forbush viewed as a "'red flag' in light of Plaintiff's past." ECF 1 ¶¶ 22–27. However, it is implausible that this action by Ms. Forbush could have been even a proximate cause of Plaintiff's termination in July 2023, more than a year later, particularly considering that Plaintiff returned to teach at Fruitland for the 2022/2023 school year. *Id.* ¶ 32. Similarly, Plaintiff's allegation that Ms. Forbush, on July 13, 2023, presented Plaintiff with the Termination Letter at a meeting with BEWC's HR Specialist is insufficient for this Court to reasonably infer that Ms. Forbush, herself, was the "actual decisionmaker" in BEWC's decision to terminate Plaintiff. *Id.* ¶ 48.

A survey of other decisions of this Court and other district courts in this circuit, analyzing the viability of a "cat's paw" theory on a motion to dismiss, appears to confirm that a key allegation to sustain the theory is that the individual with the alleged animus performed an *act* that was *intended* to bring about the adverse employment action. In *Lim v. Azar*, the court, after recognizing that plaintiff's preceptor "did not have the authority to terminate plaintiff," held that plaintiff had not adequately pleaded cat's paw liability where there was "no allegation" that plaintiff's supervisor "was either the formal decisionmaker or the actual decisionmaker for [plaintiff's] termination." 310 F. Supp. 3d 588, 602 (D. Md. 2018). In *Lim*, the plaintiff had quoted, in his complaint, correspondence between his supervisor and the formal decisionmaker (the individual who authored the termination memorandum) that the court acknowledged revealed the supervisor

"was asked to and did provide input on [plaintiff's] professional performance and workplace behavior"; however, the correspondence "made no mention of [plaintiff's] race or national origin and did not specifically recommend [his] termination." *Id.* The court held that it was "clear" that the formal decisionmaker "did not simply rubber-stamp a termination decision effectively made by" the plaintiff's supervisor, and therefore, the plaintiff had failed to allege facts that could reasonably support his discriminatory termination claim under Title VII. *Id.* at 603. In *Traore v. Baltimore Police Dep't*, the court also held that the complaint did not support a Title VII discrimination claim where plaintiff had not alleged that her former supervisor and co-worker "made the decision to terminate Plaintiff's employment or that any of them were in a position to make such a decision on behalf of BPD." No. MJM-22-793, 2023 WL 8600553, at *9–10 (D. Md. Dec. 12, 2023). The court stated that while plaintiff had alleged discriminatory bias by her former supervisor and that her supervisor was among several individuals at her place of work who "substantially took part in the process to terminate [her] employment," she had not alleged facts "to support a reasonable inference that [the supervisor] was 'principally responsible for, or the actual decisionmaker behind,' the termination decision such that [defendant] 'simply rubber-stamped [his] recommendation.'" *Id.* (quoting *Lim*, 310 F. Supp. 3d at 602). *See also Hayes v. Wall Recycling, LLC*, 729 F. Supp. 3d 553, 560 (E.D.N.C. 2024) (for a Title VII claim "[t]o proceed under the cat's paw theory" when facing a motion to dismiss, "[plaintiff] must plausibly allege (1) his supervisor harbored an unlawful animus, (2) his supervisor performed an act intended to cause an adverse employment action, and (3) [the final decisionmaker] merely rubber-stamped his supervisor's recommendation.").

By contrast, this Court has previously found that a plaintiff *had* sufficiently alleged "cat's paw" liability to defeat a motion to dismiss where the allegations supported a reasonable inference

31

that "hiring decisions were not only influenced, but determined, by derogatory reports of polygraph testing results" from tests administered by a supervisor with alleged discriminatory animus. *Arif v. Md. Dep't of State Police*, No. MJM-24-1057, 2025 WL 958776, at *7 (D. Md. Mar. 31, 2025) (slip copy). The court in *Arif* held that the reports of the polygraph test, which was a prerequisite for the positions plaintiff sought, "did more than substantially influence or play a significant role in the hiring decisions challenged in this case. They directly caused the decision to rescind the offer" to plaintiff for one position and disqualify plaintiff from consideration for another. *Id.* In *Alessa v. Phelan*, the court held that a plaintiff had sufficiently alleged a "cat's paw" theory to defeat a motion to dismiss where the plaintiff had alleged that her supervisor "created a staffing package recommending [plaintiff's] termination," and this package was distributed to final decisionmakers who, on the recommendation of that supervisor, issued a stop-work order and terminated plaintiff. No. DLB-21-0924, 2025 WL 974391, at *8–10 (D. Md. Mar. 31, 2025). Again, the emphasis is on whether a plaintiff has plausibly alleged that the individual with the alleged animus performed an *act* with the *intention* that it result in an adverse employment action.

Here, Plaintiff has failed to sufficiently allege that Ms. Forbush has made any "decision, report, or recommendation" or performed any other act with the intention to cause her termination, let alone plead sufficient facts to raise a reasonable inference that BEWC "rubber-stamp[ed]" such action. *Hill*, 354 F.3d at 290; *Staub*, 562 U.S. at 422. In fact, Plaintiff has not alleged any communication between Ms. Forbush and BEWC regarding BEWC's decision to terminate Plaintiff. Thus, this Court will grant BEWC's Motion to Dismiss this claim.[12]

---

[12] Because this Court dismisses the Rehabilitation Act claim on the foregoing bases, it need not reach the question of whether Plaintiff was an "otherwise qualified individual" (the second element of a Rehabilitation Act claim).

### C.  Count II: Denial of Procedural Due Process Rights

In Count II of her Complaint, brought pursuant to 42 U.S.C. § 1983, Plaintiff alleges that BEWC violated her right to procedural due process of law guaranteed by the Fourteenth Amendment to the United States Constitution. Specifically, Plaintiff alleges that, "[a]s a permanent employee of the Board," she had a property interest in her employment[13] and that the Board terminated her employment without having provided her with notice of her "right to appeal her removal." ECF 1 at ¶¶ 72-74. To succeed on a procedural due process claim, a plaintiff must show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011) (internal quotations omitted).

The first step in determining whether a plaintiff's procedural due process rights have been violated is to "determine '[w]hether any procedural protections are due' by deciding whether a 'liberty or property' interest within the meaning of the Fourteenth Amendment's Due Process Clause is at stake." *Rosin v. Bd. of Educ. of Charles Cnty.* ("*Rosin I*"), No. TDC-21-0983, 2021 WL 4554342, at *6 (D. Md. Oct. 5, 2011) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Roth*,

---

[13] Plaintiff "abandon[ed] any claim that she had a liberty interest in her continued employment with the Board," ECF 9-1 at 18 n.2; thus, the Court need only assess Plaintiff's allegation of a deprivation of a property interest.

408 U.S. at 577). "A property interest in public employment can be created by state statute, local ordinance, or contract." *Rosin I*, 2021 WL 4554342, at *6 (citing *Bishop v. Wood*, 426 U.S. 341, 344 (1976), and *Roth*, 408 U.S. at 576-77). The Fourth Circuit has stated that "[i]n the context of employment in public education, the independent source for the property interest has been said to be a contract which provides for continued employment, and which can be terminated only for good cause." *Royster v. Bd. of Trs. of Anderson Cnty. Sch. Dist. No. Five*, 774 F.2d 618, 620 (4th Cir. 1985); *see also Jefferson v. Sch. Bd. of City of Norfolk*, 452 F. App'x 356, 357 (4th Cir. Oct. 26, 2011) (unpublished per curiam) ("A public school teacher's property interest in employment may derive from 'a contract which provides for continued employment, and which can be terminated only for good cause.'") (quoting *Royster*).

Here, Plaintiff's contract with BEWC provided that it "shall continue from year to year," subject to the conditions provided elsewhere in the contract. ECF 5-2; ECF 9-1 at 18 (directly citing ECF 5-2). Plaintiff has alleged that, as a "certificated employee, who had tenure," she "could be dismissed only for immorality, misconduct in office, insubordination, incompetency, or willful neglect of duty, provided the charge or charges be stated, in writing, and Plaintiff be given an opportunity to be heard by the Board upon not less than 10 days-notice with the right to bring counsel and witnesses." ECF 1 ¶ 55. The language of this allegation tracks, nearly verbatim, language contained in Plaintiff's contract with BEWC (the "Regular Contract," which is a "specific agreement created by the State Board, and set forth verbatim in COMAR 13A.07.02.01(B)(2)," *Libit v. Baltimore City Bd. of Sch. Comm'rs*, 130 A. 3d 1117, 1124 (Md. Ct. Spec. App. 2016)). ECF 5-2; ECF 9-1 at 18 (reciting the same language with reference to "Ms. Moody's contract and Maryland law"). That language, itself, appears to be derived from Maryland state law providing the grounds for suspension or dismissal of a "teacher, principal, supervisor, assistant

superintendent, or other professional assistant." *See* Md. Code Ann., Educ. § 6-202(a). *See also Gladhill v. Wash. Cnty. Bd. of Educ.*, No. MJM-23-0098, 2024 WL 1243833, at *8 (D. Md. Mar. 22, 2024) (recognizing that § 6-202 contemplates a property interest in "continued *certificated* employment, and not being "suspend[ed] or dismiss[ed]" from *certificated* employment except for the five bases delineated in § 6-202(a)(1).") (emphasis added).

Plaintiff is correct that a "certificated employee" would enjoy those procedural protections prior to termination; however, as previously noted, Plaintiff has effectively conceded that she was not "certificated" at the time of her termination. Thus, even if the contract were silent on the consequences of a lapse in certification, this Court could conclude that Plaintiff's contract, which makes ubiquitous references to the "certificated employee,"[14] would not guarantee her the procedural protections she alleges. However, the contract is not silent. It expressly states, in the sentence immediately following that from which Plaintiff appears to have drawn her allegation in ¶ 55, "This contract shall automatically terminate if the employee ceases to hold a professional certificate." ECF 5-2. These elements of Plaintiff's contract with BEWC undermine any assertion that Plaintiff had a legitimate claim of entitlement to continued employment with BEWC once her certificate expired.[15]

_____

[14] The first sentence of the contract identifies the parties as the "Local Board of Education" and "the said certificated employee"; this identification is repeated throughout the contract and at its end, where it states, "The said certificated employee on his or her part accepts said employment . . . ." ECF 5-2. The section of COMAR, titled "Terms of Employment," that outlines the "Regular Contract" elsewhere refers only to "certificated professional employees," further confirming that certification is a "[t]erm of [e]mployment." COMAR 13A.07.02.01(A).

[15] In her Opposition to BEWC's motion, Plaintiff argues that BEWC's reliance upon the provision of her contract providing for automatic termination upon the lapse of a professional certificate is "misplaced." ECF 9-1 at 18. In support of this assertion, however, Plaintiff (citing to what appears to be the *current* version of COMAR 13A.12.02.02A, rather than the version in effect at the time of her termination) proceeds to argue, while conceding that she "did not timely earn the additional three credits needed to maintain her Professional Teacher License," that she remained "eligible" for a "Temporary Professional Teacher License." ECF 9-1 at 19. Plaintiff does not explain how her

Multiple other courts, faced with similar facts and relying on state law, have likewise held that when certification is a prerequisite for a public school employee's continued employment, that employee cannot assert a property interest in such employment when they lack that certification. *See, e.g.*, *Nunez v. Simms*, 341 F.3d 385, 389–91 (5th Cir. 2003) (holding, where Texas statute provided that "[a] person may not be employed as a teacher . . . by a school district unless the person holds an appropriate certificate or permit" and plaintiff's contract with school district "state[d] that failure to maintain certification 'may be grounds for dismissal,'" that teacher had "no right to continued employment while she remained uncertified when her certificate expired . . . ."); *Meyers v. Kishimoto*, 217 F. Supp. 3d 563, 578–80 (D. Conn. 2016) (concluding that, under Connecticut tenure statute for teachers that defined "teacher" as a "certified professional employee . . . ," "[a] teacher who is not certified . . . cannot have a reasonable expectation of continued employment or a protected property interest in his or her employment, under either state law or *a fortiori* under the federal Constitution."); *Moiles v. Marple Newtown Sch. Dist.*, No. CIV.A. 01-

---

alleged "eligibil[ity]" for a temporary license, or her allegations that she "*could* have been given a provisional certificate," "*could* have had her certificate reinstated" and that BEWC "failed to provide Plaintiff with the opportunity to reinstate her certificate before the start of the 2023/2024 school year," ECF 1 ¶¶ 61, 62, 65 (emphasis added), suggest a legitimate expectation of continued employment with BEWC. First, this Court notes that whatever complaints Plaintiff has regarding the procedure for *reinstatement of her certificate* (though there are no allegations that Plaintiff availed herself of that process after her termination), they would appear to be separate from her procedural due process claim, which centers solely on her termination and BEWC's alleged failure to provide notice of her alleged right to appeal that termination. *Id.* at ¶¶ 72-74. The Court further notes, *arguendo*, that the COMAR provisions cited by Plaintiff elsewhere in her Opposition for the proposition that the Board had the discretionary authority to "request a Temporary Professional License for an employee who has failed to meet the renewal requirements of a professional license," ECF 9-1 at 16, likewise, would not create a protected property interest in continued employment. *See Zimmerman v. Bd. of Educ. of Bradford*, 597 F. Supp. 72 (D. Conn. 1984) (holding that where statute mandated that teachers of a certain age be retired, the fact that the statute also gave the local board of education the discretionary authority to seek authorization to continue a teacher's employment did not create a protectable property interest in continued employment).

4526, 2002 WL 1964393 (E.D. Pa. Aug. 23, 2002) (where application of state statutory procedural requirements of notice and hearing before dismissal hinged on whether plaintiff was a "professional employee" under state law, and state law provided that maintaining a valid professional certificate was fundamental to classification as a professional employee, a tenured assistant high school principal had no property interest in his continued employment after his professional certification lapsed).

There is a notable wrinkle to Plaintiff's Complaint; namely, that, as she alleges, "the Board has allowed and continues to allow other employees to teach without their teaching certificate," ECF 1 ¶ 63, and BEWC allowed Plaintiff, herself, to continue to supervise and teach Fruitland's summer school program for more than a week after her certificate expired. *Id.* ¶ 58. In her argument in support of her due process claim, Plaintiff reiterates both of these allegations, though without elaborating on their function. ECF 9-1 at 19–20. To the extent Plaintiff references these facts to suggest that they created a legitimate claim of entitlement to her continued employment, this Court cannot draw that inference.

"A property interest in employment can, of course, be created by ordinance, or by an implied contract. In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop*, 426 U.S. at 344. *See also Perry v. Sinderman*, 408 U.S. 593, 602 n.7 ("'[P]roperty interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .' . . . If it is the law [of the state] that a teacher in the respondent's position has no contractual or other claim to the asserted property interest, the claim would fail) (quoting *Roth*, 408 U.S. at 577); *Richardson v. Town of Eastover*, 922 F.2d 1152, 1157 (4th Cir. 1991) ("While an entitlement is required before a property interest is implicated, the entitlement need not be given explicitly. An entitlement to a

renewal may be implied, for instance, from policies, practices, and understandings, *if state law or other sources support a finding of such an entitlement*.") (emphasis added). Here, even if Plaintiff were to assert that her continued employment and payment, even after expiration of her certificate, implied a property interest in continued employment, Maryland law undermines any suggestion that she could legitimately claim an *entitlement* to such employment. *See* Md. Code Ann., Educ. § 6-101 (titled "Certification Required to be Employed as County or Assistant Superintendent, Supervisor, Principal, or Teacher"); COMAR 13A.12.02.02(A) ("Each teacher employed in the public school systems of Maryland shall hold a professional certificate in the teacher's area of major assignment."); COMAR 13A.12.01.03(B)(1)(a) ("A teacher employed in an early childhood, elementary, PreK-12 or secondary school program in the public school systems of Maryland shall hold an appropriate certificate under COMAR 13A.12.02."). Against the express provisions of Plaintiff's contract and in Maryland law, Plaintiff's allegations that BEWC may have, in practice, temporarily deviated from the procedure provided by state law do not warrant the inference that state law countenances Plaintiff's claim of *entitlement* to continuation of that deviation.[16]

---

[16] A similar conclusion was reached by the Fifth Circuit where an individual was discharged after having taught for multiple years under "continuing contracts"—but without a certificate. *See Montez v. S. S.A. Indep. Sch. Dist.*, 817 F.2d 1124 (5th Cir. 1987) (where Texas law defined "teacher" as one who, among other things, holds a "permanent teaching certificate," plaintiff "was never a 'teacher' for purposes of the Texas tenure law. Any contract purporting to give him more than that allowed by Texas law was beyond the power of the school district and was thus *ultra vires*. The invalid contracts bestowed no property interest . . . . We are not unmindful that understandings between parties occasionally create a property interest, . . . but Montez has not demonstrated facts sufficient to support the creation of such an interest contrary to express and specific state law."). In addition, while factually distinct, this Court finds some support for its conclusion in the decision of Maryland's highest court, in *Halsey v. Bd. of Ed. of Garrett Cnty*. There, the court held that, despite the state board of education taking issue with circumstances of the county school board's termination of a teacher holding a probationary certificate, where the termination had occurred within the two-year probationary period provided for by statute, the state board could not extend the probationary period in contravention of the statutorily mandated term.

Moreover, this Court notes that, even if it were to proceed to the second step of the due process analysis—"determin[ing] what process is due," *Rosin I*, 2021 WL 4554342, at *6 (internal quotation marks omitted)—it could not infer that Plaintiff was entitled to the procedural protections she alleges. Beyond the fact that Plaintiff's contract contradicts her allegations,[17] Maryland courts and the Maryland State Board of Education have consistently emphasized that the pre-termination procedural requirements of § 6-202 do not apply to employees, even professional employees, who lack certification. *See, e.g.*, *Venter v. Bd. of Educ.*, 972 A.2d 328, 346 (Md. Ct. Spec. App. 2009) ("Based on our review of Ed. §§ 6-201, 6-202, & 4-205(c) and consistent with the State Board's interpretation of these provisions . . . , we conclude that a noncertificated professional employee . . . is not entitled to the appeal procedures provided by Ed. § 6-202."); *Libit*, 130 A.3d at 1123, 1126 (holding that "the Maryland Code requires compliance with ED § 6-202(a) **before** a 'teacher' may be terminated" (emphasis in original), but noting that "[t]he title and text of ED § 6-202 purport to apply to 'teachers, principals, and other professional personnel.' ED § 6-202. By contrast, we have held that 'noncertificated technical support employees,' and even 'professional noncertificated employees' do not qualify for the protections

---

331 A.2d 306, 311 (Md. 1975) ("[W]e reject the notion that despite the mandatory provisions of [the statute] limiting the probationary period to a maximum of two years, the legislature intended that the State Board be vested with discretion . . . to extend the probationary period in any case where it believed it was in the educational interest to do so."). Here, a similar argument could be made that the clear statutory mandate that certification is a term of employment as a teacher in Maryland public schools precludes the possibility that BEWC could, in its discretion, continue to employ Plaintiff without a certificate, and, thus, that its doing so could not serve as a basis for a claim of legitimate entitlement to continued employment.

[17] Where "allegations . . . contradict matters properly subject to judicial notice or by exhibit," a court is not required to accept those allegations as true. *Jefferson v. School Bd. of Norfolk*, 452 F. App'x 356, 357 (4th Cir. Oct. 26, 2011) (unpublished per curiam) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)) (internal quotation marks omitted); *see also Goines*, 822 F.3d at 167 ("When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper.").

afforded under ED § 6-202(a), and, accordingly, may only avail themselves of the appellate review process outlined in ED § 4-205(c).") (citing *Venter*, among others).

"[O]nly where the employee has a legitimate entitlement to continued employment do the requirements of due process attach." *Royster*, 774 F.2d at 621. Because Plaintiff has failed to sufficiently plead that she had that legitimate entitlement at the time she was terminated, this Court will grant BEWC's motion to dismiss the due process claim.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss will be GRANTED, and Plaintiff's claims will be DISMISSED WITHOUT PREJUDICE. This case will be closed, but Plaintiff may seek leave to amend her claims within thirty days of this Memorandum Opinion and Order, to the extent she can state a plausible claim for recovery. A separate Order follows.

Dated: November 7, 2025                                        _____/s/_____

                                                              Stephanie A. Gallagher
                                                              United States District Judge